## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **BEVERLEE W. PRIEST** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:06-CV-65** |
| | ) | |
| **ROBERT "GREGORY" BRUMMER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

This is a case brought by the Plaintiff, Beverlee W. Priest, against her former coworker Robert "Gregory" Brummer for intentional infliction of emotional distress.[1]

Following Priest's Application for Clerk's Entry of Default against Brummer, the District Court Judge, Theresa L. Springmann, entered an Order pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Northern District of Indiana Local Rule 72.1(d)(1), referring this case to the undersigned Magistrate Judge "to conduct a hearing to determine the amount of damages due and to prepare a report and recommendation on the Plaintiff's Motion for Default Judgment."  (Nov. 20, 2007, Order 2.)  That hearing was held on February 13, 2008. (Docket # 89.)

Accordingly, this Report and Recommendation addresses whether a default and default

---

[1]The Court has supplemental jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1367(a).  Initially, Priest also brought actions under the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* (Title VII) against her former employer, Schindler & Pursley, Inc. d/b/a Ossian Deli ("Ossian Deli"), for discrimination on the basis of her sex and retaliation, and under Indiana tort law for negligent hiring and retention as well as intentional infliction of emotional distress under a theory of *respondeat superior*.  (Compl. ¶¶ 2, 7, 13, 14.)  On June 25, 2007, the Court dismissed the claims against Ossian Deli pursuant to a stipulation to dismiss after a settlement.  (Docket # 65.)  Consequently, only the emotional distress claim against Brummer remains, and only matters pertaining to Brummer will be addressed in this Report and Recommendation.

judgment should be entered under Federal Rule of Civil Procedure 37(b)(2)(A)(vi), and if so, what damages should be awarded.

## II.  PROCEDURAL BACKGROUND

On March 7, 2006, Priest filed a Complaint against her former employer, Ossian Deli, alleging discrimination on the basis of sex and retaliation under Title VII and various state law claims.  (Docket # 1.)  She further alleged a claim of intentional infliction of emotional distress against "Gregory Brummer," her former coworker.  (Docket # 1.)  On July 18, 2006, Priest amended her Complaint to name Robert "Gregory" Brummer as the proper Defendant, noting that he was known to her as Gregory Brummer.[2]  (Docket # 32, First Am. Compl. ¶ 3.)

On July 24, 2006, counsel Samuel Hasler filed a notice of appearance on behalf of Brummer, and an Answer in general denial.  (Docket ## 34, 35.)  Brummer's counsel, however, subsequently filed a Motion to Withdraw, explaining that "his client has not replied to any letters sent him by counsel and counsel cannot proceed with a client who will not communicate with him."  (Docket # 51.)   Although the motion was initially denied for failing to comply with Local Rule 83.8(b), (Docket # 52), his renewed motion (Docket # 53) was later granted on May 18, 2007, and from then on, Brummer was deemed as acting *pro se*.  (Docket # 63.)

On September 4, 2007, Priest filed a Motion to Compel discovery responses.  (Docket # 66.)  The Magistrate Judge issued an Order Setting a Hearing on the Motion to Compel for September 17, 2007, and required that Priest's counsel and Brummer appear in person.  (Docket # 68.)  The Order admonished Brummer that if he failed to appear, the Motion could be granted, and that if he failed to comply with any subsequent discovery order, it "may result in the

---

[2]The record reflects some confusion regarding Brummer's name, as during the hearing held on February 13, 2008, Priest referred to him as "Craig," not Greg.

imposition of sanctions, up to and including a possible default judgment under Federal Rule of Civil Procedure 37(b)(2)(C)." (Docket # 68.)

Brummer, however, did not appear at the September 17, 2007, hearing, (Docket # 69), and the Magistrate Judge granted Priest's Motion to Compel, ordering Brummer to serve and file responses to Priest's discovery requests as well as any objections to the imposition of sanctions by October 1, 2007. (Docket # 70.) The Order warned that "[f]ailure to file an objection or response may result in the Court granting the relief sought by Plaintiff's counsel" and that his failure to comply "may result in the imposition of sanctions up to and including the entry of a default and the rendering of a default judgment under Fed. R. Civ. P 37(b)(2)(A)(vi)." (Docket # 70.)

Shortly after, Priest filed a Motion for Attorney Fees, Costs, and Expenses stemming from the Motion to Compel. (Docket # 71.) Brummer filed no objections and the Magistrate Judge ultimately awarded Priest attorney fees in the amount of $220.75. (Docket # 75.) Moreover, Brummer ignored the Order granting Priest's Motion to Compel and never responded to Priest's discovery requests.

On October 31, 2007, Priest filed a Motion for Entry of Default and Default Judgment against Brummer. (Docket # 76.) Among other things, Priest noted that Brummer failed to respond to her discovery or comply with the Court's Order "knowing that Plaintiff's counsel needs the requested information and documentation in order to prepare the Plaintiff's case and . . . fully prepare for trial." (Mot. for Default J. and Entry of Default 3.)

Priest submitted an Application to Clerk for Entry of Default on November 15, 2007. (Docket # 77.) She alleged that Brummer "was properly served with a copy of the Complaint

3

and an Alias Summons by Certified Mail . . . on July 21, 2006[,]" and that a copy of the Application was being mailed to Brummer at his last two known addresses.  (Docket # 77.)  On November 20, 2007, District Court Judge Springmann entered an Order referring this case to the undersigned Magistrate Judge to conduct a hearing and to prepare a Report and Recommendation on Priest's Motion for default, default judgment, and damages.  (Docket # 78.)

The Magistrate Judge issued a Notice and Order setting the Application for Entry of Default and Default Judgment for a hearing on December 18, 2007, and directed the Clerk to send a copy of the Order to Brummer at his last two known addresses.  (Docket # 79.)  After the Court issued an Order granting Priest's request for an extension of time and resetting the hearing for January 15, 2008, (Docket # 82), Priest filed a Motion for Damage Award in Default Judgment on December 27, 2007.  (Docket # 84.)

On January 15, 2008, the Magistrate Judge held a hearing on the application for default and the motion seeking damages.  (Docket # 87.)  While Priest appeared by counsel, Brummer failed to appear. (Docket # 87.)  The Magistrate Judge heard argument on whether a default and default judgment should be entered, took the issue under advisement, and set a hearing on the issue of damages for February 13, 2008, so Priest could appear and testify.  (Docket # 88.)

On February 13, 2008, Priest appeared in person, together with counsel.  (Docket # 89.)  Again, Brummer failed to appear.  (Docket # 89.)  Evidence was presented on the issue of damages and the Magistrate Judge took the matter under advisement.  (Docket # 89.)  Priest was afforded the opportunity to file a post-hearing brief and she did so on February 28, 2008. (Docket # 89, 90.)

## III. STANDARD OF LAW FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT AS A SANCTION

Under Federal Rule of Civil Procedure 37(b)(2)(A)(vi), when a party fails to obey a discovery order, the court may, under some circumstances, sanction that party by "rendering a default judgment against the disobedient party[.]"

"[D]istrict court judges are well aware that defaults should be entered only when absolutely necessary, such as where less drastic sanctions have proven unavailing." *United States v. Di Mucci*, 879 F.2d 1488, 1493 (7th Cir. 1989) (internal quotation marks and citations omitted). Harsh sanctions, such as default, "should usually be employed only in extreme situations, where there is a clear record of delay or contumacious conduct, or where other less drastic sanctions have proven unavail[ing]." *Litetronics Int'l, Inc. v. Technical Consumer Prods., Inc.*, No. 03 C 5733, 2006 WL 2850514, at *2 (N.D. Ill. Sept. 28, 2006) (citing *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (citations omitted)); *see also Di Mucci*, 879 F.2d at 1493, 1494 (citation omitted). "[T]here must be at least some finding of contumacious conduct, dilatory tactics, the failure of less drastic sanctions, bad faith, willfulness, or fault before sanctions may be imposed by a party who fails to comply with a discovery order." *Litetronics Int'l, Inc.*, 2006 WL 2850514, at *2 (internal quotation marks omitted) (quoting *China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, No. 97 C 2694, 1999 WL 966443, at *2 (N.D. Ill. Sept. 30, 1999) (citations omitted)).

The Seventh Circuit, however, has "declined to adopt a rule that the imposition of less drastic sanctions is an absolute prerequisite to the entry of a default judgment." *Di Mucci*, 879 F.2d at 1493 (citation omitted). "The Federal Rules of Civil Procedure . . . give ample notice to litigants of how to properly conduct themselves. A district court is not required to fire a warning

shot . . . ." *Id*. at 1493-94 (internal quotation marks and citation omitted).

A default means that the factual allegations of the complaint are to be taken as true (except those allegations relating to the amount of damages, *Di Mucci*, 879 F.2d at 1497), and can no longer be contested. *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994). However, because the default only goes to the well-pled facts of the complaint, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit to mere conclusions of law. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 (3d. ed. 1998); *see also Black*, 22 F.3d at 1399 ("The entry of a default order does not, however, preclude a party from challenging the sufficiency of the complaint." (citation omitted)). Thus, following an entry of default, the court must go on to decide if the factual allegations of the plaintiff's complaint and the evidence of record support the plaintiff's claim.

## IV.  ANALYSIS

### A.  Recommendation That the District Court Enter a Default Against Brummer

Brummer has demonstrated "a clear record of delay [and] contumacious conduct[.]" *Litetronics Int'l, Inc.*,  2006 WL 2850514, at *2. Brummer's initial failure to respond to Priest's discovery requests led to her filing a Motion to Compel, and that in turn resulted in the Court ordering discovery responses and attorney fees. The lesser measures, the imposition of fees, proved unavailing, *Di Mucci*, 879 F.2d at 1493, and Brummer also ignored two warnings that his failure to respond could result in a possible default judgment. It seems that Brummer has taken the view that if he totally ignores the Court and its Orders, perhaps the Court will ignore him, as further evidenced by his failure to attend hearings, or even respond to his own counsel, a

circumstance that ultimately led to his counsel's withdrawal.

A default is also "proportionate to the offending conduct," *China Ocean Shipping (Group) Co.*, 1999 WL 966443, at *2, which in this instance was Brummer's failure to respond to Priest's discovery requests.  For example, her discovery sought a variety of information, including all witnesses, documents, or other things that Brummer would rely upon to support the denials set out in his Answer, but it also sought other information as well, such as his criminal history including sex crimes.  (Mem. in Supp. of Pl.'s Mot. to Compel Ex. A, Interrogs. 1, 9.)  In short, Priest's discovery sought basic but important information, and Brummer's stonewalling deprived her of it.

Therefore, despite repeated admonishments from the Court about the consequence of his noncompliance and the imposition of lesser sanctions in the form of attorney fees, and all to no avail, Brummer's contumacious conduct and dilatory tactics have delayed the prosecution of this case and prejudiced Priest.  *See Litetronics Int'l, Inc.*, 2006 WL 2850514, at *2.  Accordingly, the undersigned Magistrate Judge recommends that the Court enter a default against Brummer.

As explained *supra*, an entry of a default means that the factual allegations of Priest's Complaint are to be taken as true (except those with respect to the amount of damages), *see Di Mucci*, 879 F.2d at 1497, and can no longer be contested, *see Black*, 22 F.3d at 1399.  The Court must now decide if the factual allegations of Priest's Complaint and the evidence presented on February 13, 2008, support her claim for the intentional infliction of emotional distress and damages.  Having considered the record (and in particular, the factual allegations of Priest's Amended Complaint) and the evidence on the issue of damages presented on February 13, 2008, the undersigned Magistrate Judge makes the following findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52(a), based on a preponderance of the evidence, and accordingly recommends that the District Court grant Priest's Motion for a Damage Award in a Default Judgment.  (Docket # 84.)

### B.  Findings of Fact[3]

Priest began working at the Ossian Deli in 2004 as a third shift cashier, stocker, and deli worker.  Brummer was a coworker, doing the same job on the same shift.  Priest is in her thirties, tall and thin (about 135 pounds at the time), but Brummer was substantially bigger and somewhat older.  Not long into Priest's employment, Brummer began calling her names such as "sweetheart" and "honey," and began to touch and bump into her, all of which made Priest feel uncomfortable.  In short order, Brummer's behavior escalated in that his touching became more frequent, so that it occurred whenever they worked together, but now it was accompanied by comments with sexual innuendos and propositions, and often in the presence of coworkers and sometimes even customers.  The comments were often blatantly offensive, such as when he remarked that he would like to rub oil all over her, or when he said that he wanted to eat sliced meat off her body.  He also began leaving notes for Priest at work, referring to himself as "S.A." for Secret Admirer.  Priest began to feel embarrassment and humiliation from Brummer's unwelcome and increasingly provocative behavior.

Although Priest threw away most of the notes that Brummer would leave for her, reading none in their entirety, she did read part of one that described Brummer's graphic sexual fantasies about her.  Priest only read the first few lines, but a coworker read it all and confirmed that the note was about Priest.  One of Brummer's notes described his desire to chain Priest to the deli's

---

[3]Any finding of fact deemed to be a conclusion of law is hereby incorporated as such, and any conclusion of law deemed to be a finding of fact is hereby incorporated as such.

bathroom sink so he could stick things in her until she bled.  Another note, submitted as
Plaintiff's Exhibit 4, explicitly described sex acts he apparently wished to engage in with Priest.
In total, Brummer left approximately eight such letters for Priest, sometimes tacking them in an
envelope on a bulletin board or on a beam above the cash register.  The notes gave rise to fear
and loathing on the part of Priest.

Brummer's actions also became more bold and direct; frequently he would lean into
Priest's cramped work area so as to prevent her from moving about, or he would block her exit.
Other times, Brummer's behavior was apparently designed to simply frustrate or embarrass
Priest, such as when he took her watch or when he struck her backside with a towel in front of
customers.  Actions such as frequently making sexually explicit comments or impeding Priest's
work done by Brummer in front of customers or other coworkers compounded Priest's
frustration and humiliation.  Moreover, when Brummer started coming to the deli even when he
was not scheduled to work, Priest's sense of fear and helplessness became elevated.

Brummer's behavior apparently became so unrelenting that ultimately Priest spoke with a
police officer about it, who recommended that she file a police report for her own safety,
mentioning that Brummer had a criminal history.  Priest filed a police report at the Wells County
Sheriff's Department on July 27, 2005, describing what had taken place with Brummer.  (Pl. Ex.
1.)  It was about this time that a coworker who was acquainted with Brummer told Priest that
Brummer had a criminal conviction for a sexual assault.[4]  Priest's concerns mounted after
Brummer gained unauthorized access to one of her paychecks, apparently to learn her home
address, which he then made a point of revealing to her.  Priest became so concerned about this

_____

[4]Indeed, Brummer is on the Indiana Sheriffs' Sex Offender Registry for a 2000 conviction.  (Pl. Ex. 5.)

development that she installed two exterior lights at her home to protect herself, her children, and her blind husband.  Her father-in-law, who occasionally frequented the deli as a patron, became so concerned about her safety that he would now stay throughout her shift.

Although Priest told Brummer "over one hundred times" to stop the touching, the sexually-tinged comments, and the graphically offensive letters, it did not deter his campaign of harassment.  Although Priest reported Brummer to her employer, it was to no avail.  All of these events led to Priest experiencing physical symptoms such as panic attacks, an inability to breathe, heart racing, insomnia, nightmares, headaches, feelings of helplessness, vomiting, and a resulting weight loss of approximately fifteen pounds.  Priest now would become visibly upset at work because Brummer continued to touch her, or make sexually-related comments, and in fact would cry on the job almost every day.  Brummer could see that his behavior was upsetting Priest and once he brought her to tears he would stop, but would start again the next time they worked together, bringing her once again to tears.

Priest was particularly susceptible to upset from Brummer's behavior because of a prior experience in her childhood, and ultimately she sought counseling, (*see* Pl. Ex. 2), incurring approximately $150 in charges.  She was unable to continue counseling after her first visit, however, because she could not afford it.  Although Priest thinks she might benefit from additional counseling, she offered no evidence that such counseling is necessary, and provided no details concerning its nature, extent, or future cost.  Nonetheless, Priest clearly remains troubled and upset by her ordeal, as evidenced by her credible, emotional testimony and shaken demeanor on the witness stand.

Ultimately Priest, who is the sole source of earned income for her family, had to quit her

10

job at Ossian Deli because of Brummer's behavior, and now seeks compensatory damages for

the emotional distress, out of pocket counseling and future counseling costs, and lost wages, in

the amount of $300,000.  She further argues that she is entitled to $50,000 in punitive damages.

*C.  Conclusions of Law*[5]

To make out an intentional infliction of emotional distress claim under Indiana law,

Priest must show that Brummer "by extreme and outrageous conduct intentionally or recklessly

cause[d] [her] severe emotional distress . . . ."  *Seiwert v. Spencer-Owen Cmty. Sch. Corp.,* 497

F. Supp. 2d 942, 956 (S.D. Ind. 2007) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)).

Clearly, the standard is a rigorous one, as underscored by Indiana's adoption of Section 46 of the

Restatement (Second) of Torts, *Lachenman v. Stice*, 838 N.E.2d 451, 456-57 (Ind. Ct. App.

2005), which offers the following narrative of what is required to prove such claims:

> The cases thus far decided have found liability only where the defendant's
> conduct has been extreme and outrageous.  It has not been enough that the
> defendant has acted with an intent which is tortious or even criminal, or that he
> has intended to inflict emotional distress, or even that his conduct has been
> characterized by 'malice,' or a degree of aggravation which would entitle the
> plaintiff to punitive damages for another tort.  Liability has been found only
> where the conduct has been so outrageous in character, and so extreme in degree,
> as to go beyond all possible bounds of decency, and to be regarded as atrocious,
> and utterly intolerable in a civilized community.  Generally, the case is one in
> which the recitation of the facts to an average member of the community would
> arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Seiwert,* 497 F. Supp. 2d at 957 (quoting Restatement (Second) of Torts § 46).  Indiana state

courts have interpreted this guidance as requiring some showing on the part of the plaintiff that

the conduct alleged "exceeds all bounds usually tolerated by a decent society and causes mental

distress of a very serious kind."  *Id*. (quoting *Lachenman*, 838 N.E.2d at 457) (internal quotation

---

[5]Note 3, *supra*, is incorporated by this reference.

marks omitted).

So, simply put, "[t]he tort arises when a defendant (1) engages in 'extreme and outrageous' conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another." *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999) (citations omitted). With this standard in mind, the Court turns to an application of the facts.

    1.    <u>Recommendation that the District Court Enter a Default Judgment Against Brummer</u>

Priest has presented abundant evidence (both from her Complaint and by testimony) that Brummer's actions amounted to "extreme and outrageous conduct[,]" *Seiwert,* 497 F. Supp. 2d at 956, exceeding "all bounds usually tolerated by a decent society[.]" *Id.* at 957.  Given Brummer's unrelenting drum-beat of sexually-charged comments and notes (some disgustingly graphic and explicit in nature), there is no doubt that in sum, Brummer's behavior would "arouse [the] resentment" of "an average member of the community . . . against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (quoting Restatement (Second) of Torts § 46); *see also Van Jelgerhuis v. Mercury Finance Co.*, 940 F. Supp. 1344, 1369 (S.D. Ind. 1996) ("[A] trier of fact could determine that [defendant's] actions towards these plaintiffs was beyond all bounds of decency.  [Defendant's] questions and acts towards plaintiffs as alleged were not merely unpleasant, but sexually obscene.").  This conclusion is bolstered by the fact that these events occurred *in the context of Priest's work environment*, such that she was essentially forced to choose between her job and her mental well-being.

The consistent and unrelenting nature of Brummer's behavior, despite Priest's repeated efforts to make him stop, significantly contributes to its outrageousness.  In sum, Brummer's continual comments, persistent note-writing, and unwelcome physical touching, ongoing for

months and in a public place, amounts to a form of mental torture that is "utterly intolerable in a civilized community[.]"  *Id.*

The menacing nature of Brummer's actions also adds to their outrageousness.  Subjecting Priest to his bizarre sexual fantasies is not only alarming, but adds a threatening dimension to his attempts to impose physical control over her in the workplace.  His actions also took a psychological twist, as when he gained access to Priest's check, making a point of mentioning to her that he now knew where she lived.  Priest justly, given her experience with Brummer, and her knowledge of his criminal background, filed a police report, installed security lighting on her property, and had her father-in-law present during her shifts to ensure her safety.

The evidence also leads to the reasonable inference that Brummer intended to cause Priest emotional distress.  After all, Priest told him repeatedly and emphatically that she abhorred his conduct and that he was to stop it, yet he would continue even though he knew that it would evoke a strong emotional reaction.  *See Bradley*, 720 N.E.2d at 752 (stating that the defendant's "pattern of conduct and [the plaintiff's] testimony permit[ted] an inference that [the defendant] acted with the intent to harm emotionally"); *Van Jelgerhuis*, 940 F. Supp. at 1369 (finding that in a claim for intentional infliction of emotional distress under Indiana law against a supervisor for alleged sexual harassment, "[p]laintiffs amply demonstrate[d] that a reasonable trier of fact could infer that [defendant] intended to harm them emotionally" where "[t]here is no apparent legitimate basis for [defendant's] treatment of plaintiffs . . . and each plaintiff responded affirmatively when questioned whether [defendant] intended to hurt them") (citation omitted).  There is really no other explanation for Brummer's behavior than that it was designed to cause Priest emotional distress.

Moreover, it is undeniable on this record that Brummer (and no other source) clearly caused Priest's severe emotional distress, which manifested itself in physical and psychological symptoms.  The effect of Priest's emotional strain, ongoing sleep disturbances and nightmares, daily headaches, panic and anxiety, weight loss, vomiting, and crying at work, point directly to Brummer as the cause.  And the severity of Priest's emotional distress is illustrated by the fact that her symptoms apparently persisted even after she left Ossian Deli.  It is no defense, or fact in mitigation, that Priest was especially sensitive to the type of treatment Brummer imposed.  *See Armstrong v. Gordon*, 871 N.E.2d 287, 293 (Ind. Ct. App. 2007) ("A tortfeasor takes an injured person as he finds her and is not relieved from liability merely because of her increased susceptibility to injury."); *see also* 2 Dan B. Dobbs, *The Law of Torts*, § 313, at 852 (2001) ("If the defendant's conduct would subject him to liability for severe distress to a normal person, he is also liable for damages to an especially sensitive person, even if those damages are much greater because of the special sensitivity.  This rule is merely the familiar thin skull or eggshell skull rule as applied to emotional harm.").

Consequently, because the record amply supports a claim for the intentional infliction of emotional distress, the undersigned Magistrate Judge recommends that the District Court enter a default judgment against Brummer as a sanction under Rule 37(b)(2)(A)(vi).  Thus, the issue of damages is explored next.

2.    <u>Recommendation Concerning the Amount of Damages</u>

Having established that Priest is entitled to recover from Brummer following the entry of a default, the issue of damages remains.  In Priest's Amended Complaint, she contends that she is entitled to compensatory and punitive damages, (Compl. ¶ 15), alleging that she has suffered

"extreme emotional distress[,]" as well as "embarrassment, humiliation, fearfulness, and the loss of her job and job related benefits, including income, and other damages and injuries." (Am. Compl. ¶ 12.)  The Court will first address the question of compensatory damages, and then a discussion of punitive damages will follow.

a.      Compensatory Damages

Under Indiana law, intentional infliction of emotional distress is a common law tort, *see Lachenman v. Stice*, 838 N.E.2d 451, 456 (Ind. Ct. App. 2005), and "[i]n tort actions generally, all damages directly related to the wrong and arising without an intervening agency are recoverable." *Bolin v. Wingert*, 764 N.E.2d 201, 207 (Ind. 2002) (citing *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515 (Ind. 1993)).  Priest requests $300,000 in compensatory damages for lost wages in the sum of $3,712.50, an out-of-pocket counseling expense of $150 and future unspecified counseling expenses, and her physical and mental pain.

"A plaintiff may recover . . . for lost earnings, income, or services."  I.L.E. Damages § 16 (citing *Kenwood Tire Co. v. Speckman*, 176 N.E. 29 (Ind. Ct. App. 1931)).  Priest had to quit her job as a result of Brummer's outrageous behavior, and therefore is entitled to lost wages in the sum of $3,712.50.[6]

Furthermore, plaintiffs may recover damages "for the reasonable cost of necessary medical expenses."  *Dee v. Becker*, 636 N.E.2d 176, 178 (Ind. Ct. App. 1994); I.L.E. Damages § 22.  The one-time $150 counseling fee was reasonably incurred as an expense arising out of the

---

[6]While it could be asserted that the money Ossian Deli paid in its settlement with Priest may constitute a setoff, Brummer did not assert the right of setoff in his answer, never sought to amend his answer to assert that affirmative defense, and, of course, did not present evidence on the issue at the damages hearing.  *See, e.g., Goldsmith v. Murphy*, No. 02 C 5777, 2005 WL 442230, at *2-3 (N.D. Ill. Feb. 22, 2005).

emotional distress Brummer intentionally caused Priest, supported by a letter from Priest's psychologist to Ossian Deli indicating that she was "in therapy due to emotional difficulties associated with reported sexual harassment at her work place." (Pl. Ex. 2.) Priest's susceptibility to upset from sexual harassment as a result of her past trauma further illustrates the reasonableness of Priest's seeking mental health treatment. Priest is not entitled, however, to future medical expenses or counseling because she has presented no evidence to demonstrate that it is either necessary or reasonable, *see* I.L.E. Damages § 22 ("An injured plaintiff is allowed to recover reasonable costs of necessary medical treatment, . . . including future expenses . . . . [T]he party seeking to recover these damages must prove that the expenses were both reasonable and necessary."), and thus any such expenses would speculative, *Tamko Roofing Products, Inc. v. Dilloway*, 865 N.E.2d 1074, 1078 (Ind. Ct. App. 2007) ("[T]he burden of proof with respect to damages is with the plaintiff, and the fact finder may not award damages on the mere basis of conjecture or speculation.").

As previously discussed, "'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such [intentional infliction of] emotional distress . . . .'" *Seiwert*, 497 F. Supp. 2d at 956 -957 (quoting *Cullison*, 570 N.E.2d at 31). Here, Priest compellingly testified that as a result of Brummer's conduct, she experienced humiliation, anxiety, and fear. This distress physically manifested itself in her crying, vomiting, insomnia, nightmares, panic, and weight loss, and these symptoms continued for months following her ordeal at Ossian Deli. Having observed Priest's sometimes emotional testimony, the Court is struck by the obvious mental trauma she experienced and the apparent continuing effect Brummer's acts have had on her life. Consequently, we recommend that the

Court award Priest $40,000 for her emotional distress damages.[7]

Based on the foregoing, the undersigned Magistrate Judge recommends that compensatory damages be awarded in the amount of $43,862.50.

b.      Punitive Damages

"Because punitive damages are imposed to deter and punish wrongful activity, they are quasi-criminal in nature and require a different showing than that required for an award of compensatory damages." *Westray v. Wright*, 834 N.E.2d 173, 179 (Ind. Ct. App. 2005) (citing *Cheatham v. Pohle*, 789 N.E.2d 467, 471 (Ind. 2003)).  "Punitive damages may be awarded only if there is clear and convincing evidence that defendant 'acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.'" *Williams v. Younginer*, 851 N.E.2d 351, 358 (Ind. Ct. App. 2006) (*quoting Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 520 (Ind. 1993)); *see also USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 541 (Ind. 1997); *Wohlwend v. Edwards*, 796 N.E.2d 781, 784 (Ind. Ct. App. 2003)*; Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 556-57 (Ind. Ct. App. 1999).  "Punitive damages may also be awarded upon a showing of willful and wanton misconduct[,]" *America's Directories Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1070 (Ind. Ct. App. 2005), defined as "a course of action which shows actual or deliberate intention to cause harm or which, under existing conditions, shows either an utter indifference or conscious disregard for the rights of others," *Ammerman*, 705 N.E.2d at 563 (citation omitted).

---

[7]Although Priest requests $300,000 in compensatory damages, her brief is devoid of any method of calculation about how she arrived at that sum.

Here, the evidence is clear and convincing that Brummer's actions were not merely negligent or the result of some honest error, but rather were done intentionally to upset and frighten Priest, with utter indifference to the harm that would follow.  This conclusion is confirmed by the evidence which reveals that Priest continually and assertively demanded that Brummer stop, yet he continued unabated, and continued his behavior even though he saw that it visibly upset her to the point that she was in tears.  Brummer surely could not have been simply mistaken about Priest's distress after she filed a police report against him and complained about his behavior to their employer.  Accordingly, the undersigned Magistrate Judge recommends that the Court award Priest punitive damages.

Factors to consider in determining the amount of punitive damages are the nature of the tort and the extent of the actual damages sustained, and the economic wealth of the defendant. *Bright v. Kuehl*, 650 N.E.2d 311, 316 (Ind. Ct. App. 1995) (citation omitted); I.L.E. Damages § 51.

Here, the nature of the tort warrants punitive damages.  As previously discussed, Brummer unrelentingly touched Priest and made explicit sexual comments to her and wrote her letters, despite being told to stop.  He included provocative, violent details in his propositions and letters that he knew disturbed, disgusted, and frightened Priest, and he persisted even in the face of her tearful objections.  The *persistent and unrelenting nature* of Brummer's actions *despite* his knowledge that they were unwanted, and over the span of Priest's employment with the deli, is what makes the nature of this tort so reprehensible.  Morever, his tactics were not only offensive, but also often intimidating (encroaching on her workspace, procuring her address, touching her without permission), which underscores the conclusion that punitive

18

damages are appropriate in this instance.

It has also been clearly and convincingly demonstrated that Priest suffered more than nominal damages; indeed, as discussed *supra*, the Court has determined that Priest has suffered and continues to endure emotional distress and trauma.  Thus, the force of punitive damages should condemn Brummer's actions, particularly where his outrageous conduct has subjected an innocent person to physical illness and driven her from her workplace.

"Moreover, the economic wealth of the defendant should be considered when determining the amount of punitive damages that should be awarded."  *Executive Builders, Inc. v. Trisler*, 741 N.E.2d 351, 360 (Ind. Ct. App. 2000).  Priest presented no evidence on Brummer's economic situation.  From what the facts of this case show, however, Brummer was employed as a deli worker, which indicates that he is likely employed at only minimum wage.  More precisely, if Brummer is working forty hours a week, fifty-two weeks out of the year, his income at the current rate of minimum wage would be approximately $12,000 a year.  Given the little that is known of Brummer's economic wealth, the undersigned Magistrate Judge recommends an award of punitive damages in the amount of $5,000.  *See, e.g., Fall v. Ind. Univ. Bd. of Trustees*, 33 F. Supp. 2d 729, 748 (N.D. Ind. 1998) (reducing plaintiff's punitive award on a state law claim from $400,000 to $25,000 where defendant's income was $90,000 a year).

Although Priest requests an award of $50,000, punitive damages are not for compensation, and thus "the plaintiff has no right or entitlement to an award of punitive damages" and "the trier of fact is not required to award [them] even if the facts that might justify an award are found."  *Cheatham*, 789 N.E.2d at 472.  Here, where the evidence shows a strong likelihood of modest resources, ignoring Brummer's financial condition would be error.  *See*

*Stroud v. Lints*, 790 N.E.2d 440, 446 (Ind. 2003) ("Stroud, and others whom we might seek to deter, frequently have no meaningful economic resources.  Under these circumstances, ignoring the defendant's financial condition is error.").  "An award that not only hurts but permanently cripples the defendant goes too far."  *Id.*  Moreover, "[c]urrent law recognizes that punitive damages may serve the societal objective of deterring similar conduct by the defendant or others by way of example," *id.* at 445 (citation omitted), and an award of $5,000 may be a significant sum to similar offenders and sufficient to deter like conduct.  An award of $50,000, meanwhile, is far in excess of what is reasonably necessary to punish and deter in this instance, where the evidence suggests that Brummer's means are modest.

Consequently, after examining the evidence as to the nature of the tort, the extent of Priest's damages, and Brummer's financial situation, the undersigned Magistrate Judge recommends that the Court enter a judgment for punitive damages in the sum of $5,000 for Priest.

**V.  CONCLUSION**

For the foregoing reasons, the undersigned Magistrate Judge recommends that Brummer be defaulted and that a judgment of $43,862.50 in compensatory damages and $5,000 in punitive damages, plus costs, be assessed against him.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for Priest and to Brummer at his last two known addresses.  NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations.  Fed. R. Civ. P. 72(b).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES

THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

      SO ORDERED.

Enter for this 11th day of March, 2008.

                              S/Roger B. Cosbey_____
                              Roger B. Cosbey,
                              United States Magistrate Judge